IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

CALEB A. GOETZEN,

                Plaintiff,                OPINION AND ORDER

v.

                                                21-cv-694-wmc

SHERIFF BRENT YORK,

                Defendant.

---

Plaintiff Caleb A. Goetzen, representing himself, is proceeding against Adams County Sheriff Brent York on religious exercise claims under the First Amendment and the Religious Land Use and Institutionalized Persons Act ("RLUIPA") for failing to provide group worship or Bible study for Christian inmates while he was incarcerated at the County Jail. Sheriff York has filed a motion for summary judgment on all of Goetzen's claims. (Dkt. #29.) For the following reasons, the court will grant his motion.[1]

UNDISPUTED FACTS[2]

Goetzen is a Christian of the Luteran denomination. Defendant Brent York is the

---

[1] Defendant York alternatively asserts that he is entitled to qualified immunity, but the court need not reach this argument because, as explained in detail below, plaintiff's RLUIPA claim is moot and defendant is entitled to summary judgment on the merits of plaintiff's remaining First Amendment claim.

[2] Unless otherwise indicated, the following facts are material and undisputed, and viewed in a light most favorable to plaintiff, despite his failing to respond to defendant's proposed findings of fact as required by the court's summary judgment procedures. *See Miller v. Gonzalez*, 761 F.3d 822, 877 (7th Cir. 2014) ("We must . . . construe the record in the light most favorable to the nonmovant and avoid the temptation to decide which party's version of the facts is more likely true."). The court has therefore generally accepted defendant's proposed findings of fact as undisputed, so long as they are supported by admissible evidence. But to account for the fact that plaintiff is not represented by an attorney, the court has attempted to consider those facts he disputes where some credible evidence arguably supports it, or he could reasonably have personal knowledge of it.

Sheriff of Adams County. After Goetzen's June 2021 arrest, he was housed in the Wood County Jail, where there were religious services four days a week. Before transferring to the Adams County Jail the next month, where he remained until he bonded out about 15 weeks later, Goetzen claims he was assured by Wood County jail staff, some Wood County policy or both, that he would have the same opportunity to practice his faith as existed at the Wood County Jail.[3]

However, by the time of his transfer in July of 2021, the Adams County Sheriff's Office had already adopted Covid-19 Department Guidelines suspending external visitors, except for attorneys, with the intention of limiting interpersonal contact with outsiders and with them the possible spread of the virus within the jail. Regardless of the reason, Goetzen attests that there were *no* religious services at the jail while he was incarcerated there, and he frequently made verbal requests to jail staff about having "some sort of spiritual person to come in," as well as filed a formal inmate request for religious services

---

[3] In his opposition brief, Goetzen suggests that his federal claims find support in unspecified Wood County Jail policies or in the promises Wood County Jail staff allegedly made to him before he transferred jails. He also references state law. As an initial matter, Goetzen is not proceeding on any state law claims in this case; he may pursue such claims in state court subject to any relevant statute of limitations. Regardless, state law and county policies are not proxies for federal constitutional standards in this federal, civil lawsuit. *E.g. Estate of Novack ex. rel. Turbin v. County of Wood*, 226 F.3d 525, 532 (7th Cir. 2003) ("It is only when municipal policy fails to meet federal constitutional or statutory standards that § 1983 liability may be imposed.") (citing *City of Oklahoma v. Tuttle*, 471 U.S. 808, 816 (1985)). Finally, Goetzen neither alleges that anyone at *Adams* County, much less the defendant York, gave him any "assurance" as to what services would be available. Accordingly, his reliance on assurances, Wood County Jail policies and practices, and state law provide no basis for relief here.

in August 2021, without result.[4]  (Dkt. #27 at 98:7-8.)

Still, during this time, Goetzen had access to other means of practicing his faith than an outside minister leading services.  For example, Goetzen attests that he was able to keep religious materials in his cell, including a Bible and scriptures for addressing particular problems (such as anger), and he also used religious materials made available via the jail's book cart.  Further, there were no restrictions on Goetzen's ability to practice his faith in his cell, and he was allowed to keep religious materials that he wanted to have in his cell.  He was also allowed a weekly phone call with his pastor from the Wood County Jail without limit on its duration.

At first, Goetzen spoke with his pastor on a recorded line from his cell pod, but he was later allowed to speak with his pastor in a private room on a private line after asking Sheriff York in writing for that privilege.  Those calls occurred until the last three weeks of Goetzen's stay in the jail when another inmate in his pod contracted Covid-19.  At his deposition, Goetzen speculated that he was no longer allowed to speak with his pastor because of Covid-19 protocols in the jail, but also suggested that "it was because I was making waves" by "contacting outside sources to try to get" religious services in the jail. (Dkt. #27 at 40:23-42:20.)  Regardless, Goetzen explains that his pastor would not have visited him in person, because he did not like to drive and would not have had video visits either because he did not "have the capacity for technology," and he is not pursuing any

---

[4] Goetzen alleges that because he was transferred to Adams County Jail as a "safekeeper," an inmate whose county does not have bed space to house him, he should have retained the privileges of Wood County Jail in Adams County, including in-person worship services.  However, he cites no authority for this conclusion and the Adams County Jail Inmate Rule Book in effect at the time of his stay notes that "[a]ll of the normal rules apply to [safekeepers]."  (Dkt. #31-1 at 1.)

claim based on his allegations about later being denied a few phone calls with his pastor. (*Id.* at 45:12-13.)

Once Goetzen noticed that other inmates were "jealous" of this privilege, however, he renewed his requests for group services. (*Id.* at 93:7-20; 98:23-99:9.) Goetzen attests that he also spoke with jail officers about his interest in leading group worship, but "went in circles trying to get anything accomplished," and ultimately received "either no answer or a "no" answer." (*Id.* at 64:5-6, 10.) At that point, Goetzen organized his own informal Bible study group within his cell pod that met three times before disbanding because of "a lack of energy" and "fear in the jail at that time" concerning Covid-19. (*Id.* at 49:2-6.) Goetzen acknowledges that he also "didn't have that strong theological background to answer [participants'] questions." (*Id.* at 49:8-9.) In addition, however, Goetzen did not have permission to organize or lead a study group, and when another inmate submitted a written request to do so on his and Goetzen's behalf, as well as to expand the group beyond their cell pod, those requests were denied.

Goetzen admitted at this deposition that no staff ever told him that Sheriff York had *prohibited* him from leading group worship, but York indicates that had jail staff realized Goetzen was meeting with other inmates as a Bible study group, then further meetings would have been prohibited.[5] That is because, as indicated in the Inmate Rule Book in effect while Goetzen was at the jail, inmates were forbidden from "[a]ttempting to direct,

---

[5] In his amended complaint, Goetzen alleges that jail staff denied his request to host Bible study "under the direct orders of Sheriff York." (Dkt. #7 at 1.) At his deposition, however, Goetzen walked back that assertion, explaining that he sued York not "necessarily [because] he was commanding them to shut this down or anything; right? But if the head of the snake doesn't change, neither will the body." (Dkt. #27 at 65:13-16.)

4

control, or supervise other inmates." (Dkt. #31-1 at 1.) Although Goetzen now disputes that he ever intended to lead inmates, the Jail Administrator attests that allowing inmates *any* opportunity to exercise authority over other inmates could create resentment and unrest among those who are not similarly empowered, and thus potentially undermine the overall safety and security of the jail.[6]

Goetzen also suggests alternatives existed to have allowed him to organize a discussion group or to hold in-person worship services even during the height of the Covid-19 pandemic. For one, he now contends that the kiosk computers in each of the jail's cell pods could have been used for group worship services because they offer "video and phone functions and capabilities for streaming video." (Dkt. #36 at 8.) However, the Jail Administrator attests that the kiosks do not have a speaker or speakerphone capabilities, so an audience would not be able to hear speech through the kiosk's telephone-like handset. Goetzen also argues that the TV monitor the jail uses for remote judicial hearings could have been used to broadcast religious services at night or on weekends, although the Jail Administrator explains that inmates would still not have been allowed to congregate in the enclosed room where the TV monitor is affixed to a wall due to Covid-19 restrictions, and staff would have had to clean and disinfect the room afterwards, which would have

---

[6] In his response brief, Goetzen argues that he would not have exercised any authority over other inmates. However, in his amended complaint, he also described wanting to "hold Bible study meetings for those who wished to participate" and requesting to use the jail's gym "to host Bible study." (Dkt. #7 at 1.) Goetzen further acknowledges that he had "asked about leading services" (dkt. #27 at 22:3-6), *and* stated that he wanted to "present" what he was discussing with his pastor to other inmates and "present these Bible studies" (*id*. at 93:16-24.) Thus, regardless of Goetzen's intent, the institution had reason to be concerned for security and safety to the extent other inmates might *perceive* him as a religious guide or leader, as a group organizer who is trying to answer spiritual questions.

5

disrupted the jail's ordinary operations. Nor could the monitor be moved into a cell pod for worship services because the pods do not have the necessary audio/video connections or wireless internet access. Finally, Goetzen suggests that the jail's partitioned visitation area could have been used for services, but inmates are also not allowed to congregate in that area for safety and security reasons; plus, there is no speakerphone capability in that area either.

As a result, Goetzen attests that transferring to Adams County Jail placed him in a "spiritual vacuum" that he has only been able to repair since his release by watching spiritual videos and attending church. (Dkt. #27 at 100:10-11.) Specifically, Goetzen attests that his experience at the jail impacted him in two ways: *first*, by having to litigate this lawsuit in an effort to prevent his experience from happening to anyone else while incarcerated; and *second*, by causing him to self-harm and to suffer from "stress-induced sickness" while in the jail including fatigue, nausea, and a lack of appetite. (*Id.* at 101:1.) Thus, he seeks immediate reinstatement of "all spiritual services in the jail" and monetary damages. (Dkt. #7 at 2.)

OPINION

Summary judgment is appropriate if the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the moving party meets this burden, then the non-moving party must provide evidence "on which the jury could reasonably find for the nonmoving party" to survive summary judgment. *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406-407 (7th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252

(1986)). In deciding whether to grant summary judgment, the court views all facts and draws all inferences in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255.

Generally, a court construes the filings of unrepresented parties like plaintiff generously. *See Anderson v. Hardman*, 241 F.3d 544, 545 (7th Cir. 2001) (noting that courts "construe *pro se* filings liberally"). However, summary judgment has been repeatedly referred to as the "put up or shut up" moment for parties seeking to take their claims to trial for a reason. *Johnson v. Cambridge Indus. Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (citation omitted). Thus, at this stage of the lawsuit, plaintiff must "do more than simply show that there is some metaphysical doubt as to the material facts"; he must respond to defendant's showing of a lack of material disputes of fact by designating specific facts in affidavits, depositions, answers to interrogatories or admissions establishing a genuine, triable issue. *Anderson*, 477 U.S. at 256-57, 261. And because those facts must be admissible at trial, plaintiff may not rely on prohibited hearsay, speculation, or conclusory allegations to defeat summary judgment. *See Prude v. Meli*, 76 F.4th 648, 661 (7th Cir. 2023); *Gorbitz v. Corvilla, Inc.*, 196 F.3d 879, 882 (7th Cir. 1999). Finally, a factual dispute can preclude summary judgment only if the facts "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. Under this standard, both of plaintiff's claims fall short.

I. RLUIPA

First, plaintiff alleges that he was not provided worship services or allowed to host a Bible study at Adams County Jail in violation of RLUIPA. However, the court cannot

provide plaintiff with any relief under that law because its remedies are limited to declaratory and injunctive relief. *See Walker v. Baldwin*, 74 F.4th 878, 883-84 & n.1 (7th Cir. 2023) (noting that every federal circuit court asked to address the issue has held that RLUIPA does not authorize an award of money damages against state officials in their individual capacities); *see also Vinning-El v. Evans*, 657 F.3d 591, 592 (7th Cir. 2011) ("RLUIPA does not authorize any kind of relief against public employees").

Although plaintiff also purports to seek injunctive relief in the form of an order reinstating all "spiritual services" at the Adams County Jail, he is not entitled to such relief because he is no longer incarcerated at the jail *and* can make no argument that *he* faces a strong possibility of being harmed by the same jail policy again, and thus, personally benefit from the relief requested. *See Lopez-Aguilar v. Marion Cnty. Sheriff's Dep't*, 924 F.3d 375, 395 (7th Cir. 2019) (to obtain prospective relief, there must be a risk that defendant will violate plaintiff's rights again); *see also Thomson v. Bukowski*, 812 F. App'x 360 (7th Cir. 2020) (injunctive relief becomes moot once a prisoner is transferred to a different facility).

Indeed, with Covid-19 under control, there is little risk of any detainee or inmate being denied in-person, congregate religious services, much less that this defendant will find himself incarcerated in Adams County Jail. Of course, if he did, plaintiff *might* have standing to renew his claim for injunctive relief. Accordingly, defendant is entitled to summary judgment on plaintiff's RLUIPA claim as moot.

## II. Free Exercise Clause

Defendant is also entitled to summary judgment on plaintiff's remaining claim under the First Amendment's free exercise clause. The First Amendment states that

"Congress shall make no law . . . prohibiting the free exercise" of religion, U.S. Const. Amend. I, and inmates do not lose this right to religious freedom at the jailhouse door. Still, contrary to plaintiff's assertions, such institutions may justifiably impose limitations on the right of free exercise, even some creating a "substantial burden" on its exercise, if "reasonably related to legitimate penological interests." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987). A substantial burden is one that "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thomas v. Review Bd. of the Indiana Emp't Sec. Div.*, 450 U.S. 707, 718 (1981); *see also West v. Radtke*, 48 F.4th 836, 845 (7th Cir. 2022) ("a substantial burden on religious exercise occurs when a prison attaches some meaningful negative consequence to an inmate's religious exercise, forcing him to choose between violating his religion and incurring that negative consequence").

Even if plaintiff could establish that he had to "violate his beliefs" or face a "meaningful negative consequence" while at the jail, his claim cannot proceed under the four factors established in *Turner v. Safley*, 482 U.S. 78 (1987): (1) whether there is a "valid, rational connection" between the restriction and a legitimate government interest; (2) whether the inmate retains alternatives for exercising the right to free exercise of religion; (3) the impact that accommodation of the right will have on institutional administration; and (4) whether there are other ways that officials can achieve the same goals without encroaching on the prisoner's right. *Id*. at 89-91. In weighing these factors, the court "must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them."

*Overton v. Bazzetta*, 539 U.S. 126, 132 (2003). Moreover, "the burden of persuasion is on the prisoner to *disprove* the validity of a regulation," although jail officials "must still articulate their legitimate governmental interest in the regulation" and provide some evidence supporting their concern. *Van den Bosch v. Raemisch*, 658 F.3d 778, 786 (7th Cir. 2011) (emphasis added).

Plaintiff's requests during the jail's Covid-19 lockdown for in-person, religious services, as well as to organize a Bible study, were denied. The first *Turner* factor -- whether there is a "valid, rational connection" between the restriction and a legitimate governmental interest -- is often referred to as the most important of the four. *See Singer v. Raemisch*, 593 F.3d 529, 534 (7th Cir. 2010) ("The four factors are all important, but the first one can act as a threshold factor regardless which way it cuts."). The initial burden of proof rests on the defendant official in evaluating whether there is a valid, rational connection between a restriction and an institution's legitimate penological interests. *Id.* at 536-37. However, once the defendant offers a "plausible explanation" for the restriction, the burden shifts to plaintiff to present evidence undermining the explanation. *Id.*

Defendant states plausible explanations for both of the jail's denials, especially one with an external officiant: at the time, serious health risks precluded allowing inmates to gather in groups due to the Covid-19 pandemic. Given the attendant safety and security risks to allowing such gatherings guidance during Covid-19, deference is due officials like Sheriff York's decision to bar temporarily, gatherings of any kind. *See Mays v. Dart*, 974 F.3d 810, 820-21 (7th Cir. 2020) (how to manage the spread of Covid-19 in a correctional facility in light of security concerns is a difficult question for officials that is entitled to

deference); *see also Johnson-Bey v. Lane*, 863 F.2d 1308, 1311 (7th Cir. 1988) ("The reasonableness of a regulation banning lay inmates from assuming positions of religious authority in [the prison] cannot reasonably be doubted"); *Hadi v. Horn*, 830 F.2d 779, 784, 787 (7th Cir. 1987) (allowing inmates to act as "religious leads over other inmates" is a legitimate security concern, and the proposed alternative of allowing an inmate to lead only the prayer portion of weekly Jumu'ah service would "still place an inmate in a position of authority over other inmates in the context of a religious service").

Plaintiff does not rebut either reason for restricting congregate services during the Covid-19 pandemic beyond generally questioning the seriousness of the pandemic by noting his view of "the widespread sensationalism and hysteria that was associated with it" (dkt. #36 at 11), and stating that he had no intention of wielding any influence over other inmates. Whether the sheriff's exercise of caution by prohibiting congregate services was the right call is largely beyond the point, since he is entitled to some significant leeway in making that call in the face of so much uncertainty. Similarly, whether other inmates could have perceived plaintiff as having authority over his self-serving assurances to the contrary, are also beside the point. Plaintiff's lay opinions to the contrary are *not* sufficient to overcome the jail's legitimate security and health concerns. Thus, this threshold factor weighs in defendant's favor.

The second factor does as well. Even crediting the sincerity of plaintiff's religious beliefs, and his feeling that those beliefs were given short shrift by staff at the Adams County Jail, including defendant, there is *no* dispute that he had alternative means of practicing his faith during the Covid-19 lockdown. Indeed, he had all the religious

11

materials he wanted in his cell, and there was no restriction on his individual worship or on discussing his faith individually with other inmates. While plaintiff also wanted to participate in group worship and study, describing group worship as "[o]ne of the foundational principles of [his] faith" (dkt. #36 at 3), the free exercise clause does not ensure a plaintiff's "ability to pursue each and every aspect of the practice of his religion." *Canedy v. Boardman*, 91 F.3d 30, 33 (7th Cir. 1996); *see also O'Lone*, 482 U.S. at 352-53 (explaining that although prisoners on work detail are unable to attend Jumu'ah services, they can still participate in other Muslim ceremonies and practices).

Moreover, at summary judgment, plaintiff admits that he participated in three, unsanctioned group religious meetings despite not being qualified to guide the Bible study, which jail staff would not allow him to formally organize. Instead, plaintiff was able to speak "freely with recognized leaders of [his] faith" in keeping with another of his foundational spiritual principles, which was a unique privilege extended by defendant York to speak privately with his pastor one-on-one, once a week for most his stay and for as long as he wanted. (Dkt. #36 at 3.) Plaintiff confirmed at his deposition that this privilege met his spiritual need to speak with clergy: thus, he had the opportunity to choose *and* took advantage of various alternative, meaningful means of practicing his faith while at the jail.

Turning briefly to the remaining two factors, they also weigh in defendant's favor. As for the third factor, concerning the institutional impact of plaintiff's requested accommodation, there is no reasonable dispute that allowing inmates to organize and lead religious study groups consisting solely of other inmates poses a safety and security risk.

The same was recognized when inmates gather in enclosed spaces during the Covid-19 pandemic in 2021. Although the Jail Administrator attests that it would have been possible to clean and disinfect a room after a group met, there is no evidence contradicting defendant's representation that this would require staff to set aside their regular duties to the detriment of the orderly administration of justice, safety and security for all inside the jail.

Finally, as to the fourth factor, plaintiff does not suggest a viable way for him to have organized an inmate-led, Bible study beyond speculating, without evidence, that staff could be assigned to observe the meetings. As the court has already explained, and as noted by another federal district court, "[a]llowing an inmate to conduct a religious service without a chaplain or outside volunteer would essentially allow the inmate to exercise power or control over other inmates, which could jeopardize prison security." *Carter v. Klemm*, No. 20-cv-1923, 2021 WL 3771879, at *5 (M.D. Pa. Aug. 25, 2021).

In this case, plaintiff wanted outside clergy to conduct group worship activities, and also suggested three, alternative means of providing group worship at the jail during the pandemic. However, as noted above, the Jail Administrator has explained why none of these options were viable. Plaintiff also cites to a state circuit court case in support of his position that defendant should have allowed clergy into the jail. In *Archdiocese of Milwaukee v. Wisconsin Department of Corrections*, case no. 2021CV157, the Jefferson County Circuit Court considered whether the DOC's refusal to allow clergy access to state prisons to provide religious services from March 13, 2020, to June 21, 2021, in response to the Covid-19 pandemic, violated the Wisconsin Constitution and statutory law. Even if it were a

controlling precedent, this opinion is not instructive for plaintiff's claims. *First*, it does not address federal law. *Second*, the state court concluded that while the DOC should have allowed clergy to enter state prisons when its ban on external visitors was lifted with respect to certain other groups, the DOC had *not* failed "to facilitate clergy privilege when it chose to 'lock down' the state correctional institutions to all 'external visitors'" because the health and safety risks posed by the pandemic made the "exercise of the clergy privilege unreasonable." (Dkt. #89-1 at 39-40.) To the extent the circuit court's reasoning with respect to the initial DOC lockdown can be applied to the lockdown at the Adams County Jail, plaintiff's stay at the jail occurred only during its initial lockdown period. The court is, therefore, not persuaded that *Archdiocese* decision applies here.

While the court gives the most weight to the first *Turner* factor, since the remaining factors also weigh against plaintiff, the court concludes that defendant is entitled to summary judgment in his favor on plaintiff's First Amendment free exercise claim as well.[7]

---

[7] Because plaintiff cannot establish a constitutional violation, he would also be unable to proceed to trial against defendant on a claim under *Monell v. N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978) (holding that a municipality may be held liable for constitutional violations only if the violations were caused by the municipality itself through its own policy or custom).

ORDER

IT IS ORDERED that:

1) Defendant Sheriff Brent York's motion for summary judgment (dkt. #29) is GRANTED.

2) Defendant's motion to compel (dkt #42) is DENIED as moot.

3) The clerk of court is directed to enter judgment in favor of defendant and to close this case.

Entered this 15th day of March, 2024.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge